William J. CHERNOFF et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 26725.

United States Court of Appeals
Fifth Circuit.

June 19, 1969.

Rehearing Denied July 14, 1969.

Wilford W. Naman, Donald J. Baker, of Naman, Howell, Smith & Chase, Waco, Tex., for appellants.

Johnnie M. Walters, Asst. Atty. Gen., Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, John S. Stephan, Attys., Dept. of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., Ted Butler, Asst. U. S. Atty., San Antonio, Tex., Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for appellee.

Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.

DYER, Circuit Judge:

The taxpayers[1] appeal their suit to recover federal income taxes paid under protest resulting from deficiencies assessed for the years 1962–64, contending that the assessed amounts, a portion of the profits from the operation of two Texas optometry offices purchased by the taxpayers, should be excluded from their gross income because they were subsequently paid to the vendor of the optometry businesses pursuant to the purchase contract and because no part of the amounts could be treated as payment for good will. Neither argument alters the very basic fact that the amounts were income to the taxpayers. We affirm.

The taxpayers are registered Texas optometrists involved with Drs. S. J. and N. J. Rogers in the operation of two stores in Waco, Texas, both of which are part of a group of such stores doing business under the name "Texas State Optical Company" or the symbol "TSO". In 1949 Dr. William J. Chernoff, one of the taxpayers, was employed by the Drs. Rogers in Beaumont, Texas. In 1952 Dr. Chernoff entered into a contract with the Drs. Rogers whereby he was to be employed for ten years in Waco, Texas, in the Waco branch of the TSO optometry group (TSO of Waco). Under the contract Chernoff was to purchase a one-fourth interest in the TSO of Waco office for an amount equivalent to two percent of the annual net cash receipts during the ten year period, payments to be made annually, with an option to purchase the remaining three-fourths interest over the following ten years, 1962–72, for an amount equivalent to five percent of the net cash receipts, payable monthly.

The 1952 employment-purchase contract provided that Chernoff was to have exclusive use of the TSO trade name in the county and that the Drs. Rogers were not to engage in a similar business in the county. The Drs. Rogers breached these agreements, however, by opening a second TSO office in the county in 1961 (TSO of Lake Air). As a result of the dispute over this, the parties entered into a new contract in 1961 which recited that the one-fourth interest was paid in full and that the effective date of purchase of the remaining three-quarters interest was April 1, 1961, with payment for the remaining three-quarters commencing as of that date.

The 1961 contract also provided for the purchase of a fifty percent interest in the TSO of Lake Air office. The taxpayer was to purchase this interest for an amount equivalent to five percent of the annual net cash receipts of the Lake Air office, payable annually from June, 1962, through 1972, during which period the taxpayer was to receive fifty percent of the net profits from the Lake Air office as full compensation for managing it. Also under this contract, the taxpayer agreed to purchase the remaining

---

1. William J. Chernoff and his wife, and Samuel J. Chernoff and his wife. The wives are parties because joint tax returns were filed.

fifty percent interest between 1971 and 1981, again for an amount equivalent to five percent of the annual cash receipts.

Both the 1952 contract and the 1961 contract provided that the Drs. Rogers were to establish all rules and regulations regarding operation of both TSO offices. The Drs. Rogers utilized this power extensively, setting operational policies through numerous memoranda and directives, examples of which were introduced into evidence. Other than examining one patient on the opening day of the downtown Waco office in 1952, the Drs. Rogers were not thereafter present in either the downtown or Lake Air office. The remaining contact the Drs. Rogers maintained with the two offices was through the series of policy memoranda sent to the two offices, the same as were sent to the other thirteen TSO offices under the direction of the Drs. Rogers.

We are unimpressed with the various arguments offered by the taxpayers in an attempt to convince us that the amounts paid to the Drs. Rogers pursuant to the purchase contracts were not, upon their immediate receipt, a part of the taxpayers' gross income. The District Court found that ownership of the taxpayers' interests in the two TSO offices passed as of the beginning dates of the respective payment periods. This fact, which is no more than that recited by the 1961 contract, is not "clearly erroneous," and as such we are bound by it. Rule 52, F.R. Civ.P. Thus, during each tax year in question the taxpayers owned the downtown Waco office and fifty percent of the Lake Air office.

 The taxpayers argue that no part of the payments to the Drs. Rogers should be deemed payment for good will but rather that it constituted a partnership share in the profits of the business. However, whether the amounts can be considered as payment for good will or not is wholly irrelevant to the question whether when received they constituted ordinary income, and under the purchase contract of 1961 the receipts constituted gross income to the taxpayers as owners of the downtown office and fifty percent of the Lake Air office. Under section 61 of the Internal Revenue Code of 1954 gross income includes all income, from whatever source derived, including compensation for services and the distributive share of partnership gross income. Commissioner of Internal Revenue v. Glenshaw Glass Co., 1955, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483. The fact that a taxpayer may use a portion of his profits from a business for fulfillment of a contractual obligation to pay for it does not alter the basic fact that it is includable gross income.

Affirmed.